UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-23721-ALTMAN/Reid

JOHN JEROME JEANTY,

    *Plaintiff*,

v.

ANTILLEAN MARINE SHIPPING, CORP.,

    *Defendant*.

_____/

## ORDER

Our Plaintiff, John Jerome Jeanty, has filed a Motion to Remand [ECF No. 42]—which, after careful review, we now **DENY**.[1]

## THE FACTS

In February 2018, Jeanty hired the Defendant, Antillean Marine Shipping Corp., to ship his 2002 Mack Truck from Florida to Haiti for $7,250.[2] *See* Amended State Court Complaint [ECF No. 1-2] ¶ 7. This wasn't the first time the two had done business together. *See* Nancy Perez[3] Depo. at 21:25–22:6 [ECF No. 42-2] (Q: "[Y]ou've worked with Mr. Jeanty in the past, correct?" A: "He had

---

[1] The Motion to Remand is ripe for resolution. The Plaintiff filed his Motion to Remand on October 16, 2023. *See* [ECF No. 42]. On October 30, 2023, the Defendant filed a timely Response to the Motion to Remand (the "Response") [ECF No. 48]. The Plaintiff replied to the Response (the "Reply") on November 6, 2023. *See* [ECF No. 49].

[2] Jeanty says that he resided in Miami-Dade County, Florida, during the times in question. *See* Amended Complaint ¶ 1. Antillean is a Florida corporation doing business in Miami-Dade County. *Id.* ¶ 2.

[3] Jeanty also sued Nancy Perez, believing her to be Antillean's "agent/owner." Complaint ¶ 3. It turns out, though, that she's just the company's "Traffic Coordinator." *See* Nancy Perez Depo. at 8:24–9:1 (Q: "And what's your . . . current position?" A: "Traffic coordinator." Q: "And what does the traffic coordinator do?" A: "We just handle the shipments for Haiti."). She's since been dismissed from the suit. *See* Perez's Motion for Summary Judgment [ECF No. 26] at 1–2 ("While Plaintiff did enter into a carriage contract with Antillean, a carrier, there is no privity of contract between Plaintiff and Perez, who never signed the document nor is explicitly named as a beneficiary in its provisions."); *see also* Joint Stipulation of Dismissal [ECF No. 34].

done previous shipments, yes." Q: "Okay. About how many, do you know?" A: "No. . . . It's a lot."). After the vehicle was delivered to Antillean, Jeanty "noticed issues with [its] transportation" to Haiti and inquired about the truck's status. *Id.* ¶¶ 8–9. These inquiries went nowhere because the truck never made it to Haiti (for reasons we'll discuss shortly). *Id.* ¶ 9. On November 9, 2020, Jeanty sued Antillean (and Nancy Perez) in Florida's Eleventh Judicial Circuit. *See generally* Original State Court Complaint [ECF No. 1-4]. He would eventually amend that Complaint on October 22, 2022, alleging six causes of action[4] and seeking a total of $184,000 in damages.[5] *See generally* Amended State Court Complaint.[6]

On November 11, 2022, the Defendants timely removed the case here. *See* Notice of Removal [ECF No. 1]. In doing so, they asked us to exercise our federal-question jurisdiction because (they said) the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 *et. seq.*, "governs all transportation of goods by sea between the United States and foreign ports from the time they are loaded on or the time they are discharged from the ship." *Id.* ¶ 3. According to the Defendants, "[t]he truck was to be transported pursuant to ocean carrier Antillean's regular form bill of lading, which incorporates the terms and conditions of COGSA through its Clause Paramount, making COGSA applicable to the entire time the cargo is in the custody of the carrier, including the period of time prior to the loading of the cargo on board the vessel and after discharge of the vessel." *Id.* ¶ 4.

Jeanty didn't challenge removal because he was under the impression that the truck disappeared at some point *during transit* to Haiti. *See* Motion to Remand [ECF No. 42] ¶ 1 ("Before litigation commenced and throughout this lawsuit, Defendants have claimed that the truck *was shipped*

---

[4] The six causes of action were: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) fraud in the inducement; (4) violation of Florida's Deceptive and Unfair Trade Practices statute; (5) negligent misrepresentation (as to Nancy Perez only); and (6) civil theft. *See generally* Amended Complaint.
[5] This represented the sum of the following claims: $42,250 for the value of the truck and the money paid to Antillean; $15,000 for lost sales; and $126,750 in treble damages for civil theft under FLA. STAT. § 772.11. *Id.* at 10–11.
[6] Because this is the operative complaint, we'll refer to it as the "Amended Complaint."

with Plaintiff's additional items to Haiti, and they did not know the whereabouts." (cleaned up)). Under such a scenario, Jeanty apparently agreed with the Defendants that COGSA applied. *See id.* ¶ 3 (acknowledging that COGSA "governs all transportation of goods by sea between the United States and foreign ports from the time they are loaded on or after the time they are discharged from the ship.").

Shortly after removing the case to federal court, the Defendants filed a Motion to Dismiss Counts II–VI of the Amended Complaint. *See* Motion to Dismiss [ECF No. 3]. We granted that motion by default because Jeanty failed to respond. *See* January 18, 2023, Paperless Order [ECF No. 10]. That left us, then, "with a single breach-of-contract claim worth (according to the Plaintiff) $42,500." *Ibid.* We thus ordered the Defendants to "show cause why we shouldn't remand this case." *Ibid.* The Defendants responded to our order by making the same argument they had made in their Notice of Removal. *See generally* Response to Order to Show Cause [ECF No. 11]. Specifically, the Defendants asserted that COGSA *both* "governs all transportation of goods by sea between the United States and foreign ports" *and* "allows the parties to extend its application by contract." *Id.* ¶¶ 4–5. Because (the Defendants added) "[t]he truck was to be transported pursuant to ocean carrier Antillean's standard form bill of lading [which] incorporates the terms and conditions of COGSA through its Clause Paramount, . . . COGSA [was] applicable to the entire time the cargo [was] in the custody of Antillean Marine." *Id.* ¶ 6. And, since "COGSA completely preempts the field," they concluded, Jeanty's "'artfully plead' state law breach of contract cause of action is in reality a claim arising under COGSA, and thus removable." *Id.* ¶ 7.

On March 2, 2023, the Defendants responded to the Amended Complaint, denying all of Jeanty's allegations as to the only remaining cause of action (breach of contract). *See generally* Answer and Affirmative Defenses to Amended Complaint [ECF No. 18]. They also asserted five affirmative defenses, the first of which stated that "all claims presented by the Plaintiff[ ] are subject to the terms,

3

conditions, and limitations contained in the ANTILLEAN MARINE's regular form Bill of Lading and Tariff that was in use on February 14, 2018." *Id.* at 3.[7]

The trajectory of the case abruptly changed in July 2023, however, when Jeanty "was informed by the Defendants . . . that they never transported the truck" but, rather, "sold [it] for profit." Motion for Remand ¶ 5. According to Jeanty, "this was the first time [he] received any explanation as to what happened to his truck." *Ibid.* "Immediately thereafter," Jeanty says, he "requested better answers to his previous discovery requests and depositions of the individuals who failed to ship and decided to sell the property[.]" *Id.* ¶ 10.

On August 30, 2023, Jeanty deposed Perez. According to Perez, somebody delivered the truck to Antillean's Florida terminal on Jeanty's behalf on February 14, 2018. *See* Perez Depo. at 23:7–9 (Q: "When did he first bring the truck to you?" A: "February 14 of 2018."). Normally, Perez testified, "when [a] vehicle arrives at the terminal, the customer usually comes in with the title, they fill out the paperwork . . . for us to be able to do the U.S. customs validation. They give us the shipping instructions and make payment. Customs validation takes about . . . 72 hours. Once the validation is done, then we prepare the shipment for the next available sailing." *Id.* at 10:5–12. But that didn't happen with this truck because Antillean "did not have documents. We did not have a title for the truck." *Id.* at 23:5–6. So, rather than process this truck for shipment, Antillean let the truck sit on its Florida lot "for over a year" before it was ultimately "disposed of." *Id.* at 7:4–8; *see also id.* at 12:23–13:2 ("[A]nything that's [at the terminal] past six months is considered abandoned," and Antillean "has the right to dispose of [it]."). Shortly after the truck was disposed of, Jeanty finally supplied the

---

[7] The other affirmative defenses were: (2) "the Amended Complaint fails to state a claim for which relief may be granted"; (3) "Plaintiff's claims are time-barred by the applicable statute of limitations"; (4) "the actions of [the Plaintiff] are the factual and legal cause of the alleged damages sought"; and (5) "the actions of third parties are the factual and legal cause of the alleged damages sought[.]" Answer at 3.

4

paperwork—and perhaps the payment—required to ship it (along with his other cargo). *See id.* at 25:18–26:1 (Q: "Mr. Jeanty did make a payment to you, correct?" A: "I believe a year later." Q: "So after he made the payment you were ready to ship the cargo, correct?" A: "After he makes the payment and provides paperwork, uh-huh."). Perez then processed Jeanty's cargo for sailing, at which point she learned that the truck had been disposed of. *See id.* at 27:24–28:3 (Q: "So you was notified the Monday after the cargo was shipped that the truck had been disposed of?" A: "Yes."). Sometime after that, Perez claims that she notified Jeanty about what had happened to the truck.[8]

Jeanty next deposed Antillean's executive vice president (and corporate representative), Yeline Valdes, whose testimony corroborated Perez's. Valdes said that Jeanty's Mack Truck "was sold for scrap" to a man named Ramon Rodriguez. Valdes Depo. [ECF No. 42-1] at 7:18, 9:3. According to Valdes, if cargo remains on Antillean's premises "past six months, as our terms describe, it's considered abandoned cargo. No payment was made [by Jeanty]. It was just considered abandoned cargo." *Id.* at 13:18–21 (cleaned up).[9]

Notably, both Perez and Valdes denied that a bill of lading was ever issued for Jeanty's Mack truck. According to Perez, whoever dropped off the truck on Jeanty's behalf at Antillean's facility would have received a "dock receipt," which is "issued at the time of delivery . . . to the terminal." Perez Depo. at 37:14–21. And, indeed, this dock receipt (or "Warehouse Receipt" as it's officially

---

[8] If, when, and how Perez notified Jeanty about the sale of the truck is in dispute. *See generally* Perez Depo. at 61:10–69:16. But that dispute isn't relevant to the question of remand.

[9] Antillean isn't a paragon of recordkeeping. They, for instance, have no receipt of the sale of Jeanty's truck to Ramon Rodriguez. *See* Valdes Depo. at 8:22–9:1 (Q: "So there was documentation regarding the selling of the vehicle?" A: "No. It was scrapped." Q: "Did you receive a receipt?" A: "No."). But, based on what Perez and Valdes have gleaned from the limited records they do have—and what we have gleaned from their depositions—it appears that the truck was sold to Rodriguez in September or October of 2019. *See id.* at 16:14–17:13 (discussing the date of this sale). Jeanty then supplied payment of some kind in November of 2019. *See id.* at 24:8–15 (A: "From my understanding, he made a payment in November of 2019. . . . [T]hat was after I sold [the truck to Rodriguez]." Q: "Okay. So he never made a payment prior to November 2019?" A: "Correct. For those vehicles in question—actually, the Mack truck, no payment was made.").

called) for Jeanty's truck has been filed on the docket, *see* [ECF No. 3-1], and was presented to Perez during her deposition. When asked whether the "customer [has] to sign this dock receipt," she said: "[n]ot if they're not present at the time. And . . . it says that [the Mack truck] was delivered by a trucking company, so the customer wouldn't have been present when it was delivered." Perez Depo. at 39:6–13. A bill of lading is a different story, though. When asked about a bill of lading, Perez answered that she didn't have any "for deliveries of cargo [to Antillean]. A bill of lading is issued at time of export." *Id.* at 41:3–5. Valdes was more explicit when she described Jeanty's situation: "[T]here was no bill of lading issued, there is really no contract. It was never sent to be shipped. They didn't pay." Valdes Depo. at 13:16–18. She later reiterated this point, saying: "[Jeanty] never paid. A bill of lading was never issued. He didn't bring the correct documentation to be able to go through customs first to validate the vehicle. If that's not done, no bill of lading will be issued." *Id.* at 29:22–30:1.

On September 13, 2023, Antillean—the lone remaining Defendant—filed a Counterclaim [ECF No. 39], claiming in a single breach-of-contract count that Jeanty owed $945,523.25 of storage fees for the "601 days of unjust and undue delay of shipment and clear abandonment of his vehicle." Counterclaim ¶ 18. Jeanty timely answered, denying all liability and asserting several affirmative defenses. *See generally* Answer to Counterclaim [ECF No. 40].

Two weeks later, Jeanty filed this Motion to Remand, arguing that COGSA doesn't apply here because the truck "was sold for profit" before ever being loaded onto an Antillean vessel—and because the "Defendants testified that there was no valid agreement to ship and no bill of lading." Motion to Remand ¶¶ 5, 14, 19.[10] Instead, Jeanty contends that "this is a storage lien matter governed by Florida Statute § 83.806." *Id.* ¶ 18. In its Response, Antillean appears to concede that, by its own terms, COGSA doesn't apply to this situation. Still, it notes that COGSA allows parties to

---

[10] This obviously conflicts with what Jeanty alleged in his Amended Complaint, the ramifications of which we'll discuss shortly.

6

contractually extend the statute's application to an earlier point in time. *See* Response at 3 ("The law is well-settled that parties may agree to apply COGSA to other periods of transit . . . by so indicating in their contract."). And that, Antillean says, is exactly what it and Jeanty did here. According to Antillean, it "issued a 'Warehouse Receipt' upon receipt of the subject vehicle, which reads in relevant part: 'Received the above described cargo in apparent good order and condition, except as noted, for shipment to the indicated port, **subject to the terms and conditions contained in the Carrier's regular form Bill of Lading and Tariff**[.]'" *Ibid.* (quoting the Warehouse Receipt (emphasis in original)). And (Antillean continues) its form bill of lading's "terms and conditions expressly state[ ] that COGSA governs 'between the time of receipt of the Goods by the Carrier at the port of loading and the time of delivery by the Carrier at the port of discharge[.]'" *Id.* at 4 (quoting Antillean's form bill of lading).

With that background in mind, we turn to the question at hand: Is Jeanty bound by the terms and conditions of Antillean's form bill of lading *even though* he never received a specific bill of lading for his Mack truck? If he is, then we have subject-matter jurisdiction over this case. If he isn't, then we must remand this case to Florida's Eleventh Judicial Circuit.

## THE LAW

A federal court should remand to state court any case that has been improperly removed. *See* 28 U.S.C. § 1447(c). The party attempting to invoke the federal court's jurisdiction bears the burden of establishing that jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc.*, 298 U.S. 178, 189 (1936). "Not only does the language of the Act of 1887 evidence the Congressional purpose to restrict the jurisdiction of the federal courts on removal, but the policy of the successive acts of Congress regulating the jurisdiction of federal courts is one calling for the strict construction of such legislation." *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941). Indeed, "[d]ue regard for the rightful independence of state governments, which should actuate federal courts, requires that they

scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934).

"Federal courts exercise limited subject matter jurisdiction, empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution or otherwise authorized by Congress." *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) (cleaned up). "Congress granted federal courts jurisdiction over diversity actions and cases raising a federal question. If jurisdiction is based on either of these, the pleader must affirmatively allege facts demonstrating the existence of jurisdiction and include 'a short and plain statement of the grounds upon which the court's jurisdiction depends.'" *Ibid.* (quoting FED. R. CIV. P. 8(a)).

"Under the federal question jurisdiction statute, 28 U.S.C. § 1331, a district court has subject matter jurisdiction over 'all civil actions arising under the Constitution, laws, or treaties of the United States.'" *Smith v. GTE Corp.*, 236 F.3d 1292, 1310 (11th Cir. 2001) (quoting 28 U.S.C. § 1331). "Whether a claim arises under federal law for purposes of 28 U.S.C. § 1331 is generally determined by the well-pleaded complaint rule, 'which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'" *Ibid.* (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)). In other words, "[f]ederal question jurisdiction exists only when the 'well-pleaded complaint standing alone establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Baltin v. Alaron Trading Corp.*, 128 F.3d 1466, 1472 (11th Cir. 1997) (quoting *Franchise Tax Bd. of the State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 27–28 (1983)).

Although courts continue to apply the well-pleaded-complaint rule, the Supreme Court has said that the delicate balance of federalism concerns has "kept [it] from stating a 'single, precise, all-embracing' test for jurisdiction over federal issues embedded in state-law claims between nondiverse

8

parties." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). The Supreme Court has therefore refused to "treat[ ] 'federal issue' as a password opening federal courts to any state action embracing a point of federal law." *Ibid.*

Under the well-pleaded-complaint rule, a federal court generally cannot exercise federal-question jurisdiction over a case just because the defendant advances a *federal* defense to a *state*-law claim. *See Cmty. State Bank v. Strong*, 651 F.3d 1241, 1258 (11th Cir. 2011) ("Federal jurisdiction cannot be predicated on an actual or anticipated defense." (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009))). But there's one main exception to this general rule: "Under the complete preemption doctrine, a complaint that (on its face) raises only state-law claims can still be removed 'when a federal statute wholly displaces the state-law cause[s] of action through complete pre-emption.'" *Poet Theatricals Marine, LLC v. Celebrity Cruises, Inc.*, 2023 WL 3454614, at *3 (11th Cir. May 15, 2023) (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)).

In evaluating whether the "particular factual circumstances of a case give rise to removal jurisdiction, we strictly construe the right to remove and apply a general presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal jurisdiction are to be resolved in favor of remand." *Scimone v. Carnival Corp.*, 720 F.3d 876, 882 (11th Cir. 2013) (cleaned up); *see also Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("[W]here plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand.").

## ANALYSIS

Before getting to the heart of Jeanty's Motion to Remand, we must clarify whether he's still prosecuting this case on the theory that he and Antillean entered into a contract to ship his Mack truck to Haiti. That's the claim he appears to advance in his Amended Complaint. *See* Amended Complaint ¶ 13 ("On February 2018, Plaintiff Jeanty and Defendants entered into a contract, a true and correct copy of which is attached hereto as Composite Exhibit A[.]") And, indeed, the *only* live claim Jeanty

9

still has is his first breach-of-contract claim. *See* January 18, 2023, Paperless Order ("granting by default the Defendants' Motion to Dismiss Counts II, III, IV, V, and VI of the Plaintiff's Amended Complaint"). But we're now less sure about what *exactly* Jeanty is alleging. *See* Motion to Remand ¶ 16 ("[P]laintiff does not wish to abandon his claim. However, due to the deposition testimony of Yeline Valdes and Nancy Perez, Defendants' have testified that there was no valid agreement/bill of lading to ship the truck[.]"). If Jeanty now believes that there was no contract, he should seek our leave *either* to voluntarily dismiss his case (so he can start anew in state court) *or* to re-amend his Amended Complaint. *See Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1228 (11th Cir. 2013) (noting that a plaintiff—albeit in the summary-judgment context—may not "attempt to amend its complaint . . . without seeking leave of court pursuant to [FED. R. CIV. P.] 15(a)(2)."); *see also Pensacola v. City of Pensacola*, 2015 WL 12516688, at *3 (N.D. Fla. Mar. 13, 2015) (Vinson, J.) ("To revise or expand on their claims, plaintiffs must amend their complaint."). Until Jeanty does that, though, we're left with no choice but to treat the allegations in the Amended Complaint as the operative ones. *See Pensacola*, 2015 WL 12516688, at *3 ("A basic principle of law . . . is that the claims a plaintiff brings before a court are controlled by, and limited to, those set forth in the complaint."). And, based on the allegations *as they appear* in Jeanty's Amended Complaint, we assume Jeanty and Antillean *had* entered into a contract to ship the Mack truck to Haiti.

### A. COGSA explained

COGSA "governs 'all contracts for carriage of goods by sea to or from ports of the United States in foreign trade." *Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co., Ltd.*, 215 F.3d 1217, 1220 (11th Cir. 2000) (quoting 46 U.S.C. § 1312 (1999)). Antillean is right that, when it applies, COGSA "provides an exclusive remedy, barring all other theories of liability." Response at 4. Indeed, "COGSA affords one cause of action for lost or damaged goods which, depending on the underlying circumstances, may sound louder in either contract or tort." *Polo*, 215 F. 3d at 1221. When COGSA

applies, then, any claims advanced under theories of liability outside of COGSA's statutory scheme must be dismissed. *See LIG Ins. Co. Ltd. v. Inter-Fla. Container Transp., Inc.*, 564 F. App'x 495, 495 (11th Cir. 2014) (noting (without issue) that, "[b]ecause COGSA provides an exclusive remedy, the district court dismissed [the plaintiff's] claims for bailment and negligence"). In other words, COGSA is completely preemptive. *See, e.g., Miami Warehouse Logistics, Inc. v. Seaboard Marine, Ltd.*, 2018 WL 1093592, at *2 (S.D. Fla. Jan. 16, 2018) (Cooke, J.) ("COGSA governs this dispute and completely preempts [the plaintiff's] state-law breach of contract and negligence claims."); *UTI, U.S., Inc. v. Bernuth Agencies, Inc.*, 2012 WL 4511304, at *5 (S.D. Fla. Oct. 1, 2012) (Altonaga, J.) ("Because 'COGSA leaves no state remedy in its wake, it provides an exclusive remedy and is therefore completely preemptive' of [the plaintiff's negligence and bailments counts]." (cleaned up)). Our question, then, is whether COGSA applies here.

COGSA jurisdiction is normally triggered when the cargo in question has been loaded onto the carrier's vessel. *See Polo*, 215 F.3d at 1220 ("COGSA governs during the time after cargo is loaded and before it is removed from the ship[.]"); *see also Distribuidora N.Y. S. de R.L. v. Great White Fleet Liner Serv., Ltd.*, 2019 WL 13141570, at *4 (S.D. Fla. Dec. 13, 2019) (Dimitrouleas, J.) ("COGSA only governs from the time the goods are loaded on the ship to the time they are discharged from the ship."). And the statute itself makes this clear. *See* 46 U.S.C § 30701, Stat. Notes § 13 ("This Act shall apply to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade."); *see also id.*, Stat. Notes § 1 ("The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."). Because Jeanty's Mack truck was sold *before* it could be loaded onto one of Antillean's vessels, COGSA's application here is a bit more complicated. *See Underwriters at Int. Under Bailee Ins. Pol'y No. 09RTAMIA1158 v. SeaTruck, Inc.*, 858 F. Supp. 2d 1334, 1338 (S.D. Fla. 2012) (Scola, J.) (noting that a theft of cargo from

11

a carrier's shoreside warehouse "undisputedly occurred outside of the default loading-to-delivery period of COGSA application").

By its own terms, COGSA empowers parties to a shipping contract to extend the statute's coverage to an earlier point in time. *See* 46 U.S.C. § 30701, Stat. Notes § 7 ("Nothing in this Act shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of the goods *prior to the loading on* and subsequent to the discharge from the ship on which the goods are carried by sea." (emphasis added)); *see also Miami Warehouse*, 2018 WL 1093592, at *2 ("Where COGSA does not apply by operation of law, the parties to a bill of lading may incorporate the statute as a contractual term." (quoting *Sail Am. Found. v. M/V T.S. Prosperity*, 778 F. Supp. 1282, 1286 (S.D.N.Y. 1991))). It has therefore become common practice for carriers to "extend COGSA to pre-loading . . . periods," during which they have "actual physical custody of or responsibility for the cargo." *Underwriters*, 858 F. Supp. 2d at 1339.

### B. Even though no *specific* bill of lading was issued for Jeanty's truck, the terms and conditions of Antillean's *regular form* bill of lading—and thus COGSA—apply.

As we've established, COGSA *might* apply to our case. But, to determine whether it does, we must decide whether the parties agreed to extend COGSA coverage to Antillean's pre-shipment possession of the truck. Antillean says that's exactly what happened. According to the company, when the driver dropped off Jeanty's Mack truck at Antillean's facility on February 14, 2018, the Antillean employee who received the truck handed the driver a Warehouse Receipt. *See* Response at 3 ("[O]n February 14, 2018, Defendant issued a 'Warehouse Receipt' upon receipt of the subject vehicle[.]"); *see also* Perez Depo. at 38:3–23 (explaining that an Antillean employee, Juan Hernandez, signed the Warehouse Receipt for Jeanty's truck—albeit on the wrong line—before providing it to the driver). That Warehouse Receipt, in turn, states: "Received the above described cargo . . . for shipment to the indicated port, **subject to the terms and conditions contained in the Carrier's regular form Bill**

**of Lading and Tariff now in use**. In accepting this warehouse receipt, the shipper, consignee and owner of the goods agree to be bound by all of the stipulations, exceptions and conditions, whether written, printed or stamped, on the carrier's bill of lading." Response at 3–4 (quoting the Warehouse Receipt). And Antillean's regular form bill of lading says: "This Bill of Lading shall have effect subject to the provisions of [COGSA] in respect of carriage of goods to or from ports in the United States. . . . . [COGSA governs] between the time of *receipt of the Goods by the Carrier* at the port of loading and the time of delivery by the Carrier at the port of discharge[.]" *Id.* at 4 (quoting Antillean's regular form bill of lading (emphasis added)). In Antillean's view, then, "the parties were contractually bound by COGSA from the time that the truck was delivered to Antillean[,] and the claims asserted by [Jeanty] in this case are governed by COGSA." *Ibid.*

Jeanty doesn't dispute most of this. Again, he asserts in his Amended Complaint that he "and Defendants entered into a contract, a true and correct copy of which is attached hereto as Composite Exhibit A and incorporated herein by reference, to ship a 2002 Mack Truck." Amended Complaint ¶ 13 (referencing the Warehouse Receipt). By adopting the Warehouse Receipt as a binding contract, Jeanty has saved us considerable work. We, for instance, don't need to determine whether the driver who delivered the truck to Antillean was Jeanty's agent[11] or whether the Warehouse Receipt—which wasn't signed by the driver (or by Jeanty)—satisfies Florida's statute of frauds.[12] The parties do,

---

[11] "In simple terms, agency may be defined as the relation which results where one person or entity, called the principal, authorizes another, called the agent, to act for it with more or less discretionary power, in business dealings with third persons." *Sarmiento Lopez v. CMI Leisure Mgmt., Inc.*, 591 F. Supp. 3d 1232, 1238 (S.D. Fla. Mar. 8, 2022) (Bloom, J.) (quoting *Econ. Research Analysts, Inc. v. Brennan*, 232 So. 2d 219, 221 (Fla. 4th DCA 1970) (cleaned up)). "To prove an agent-principal relationship existed, the following elements must be proven: '(1) acknowledgment by the principal that the agent will act for him or her, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the action of the agent.'" *WB's Septic & Sitework, Inc. v. Tucker*, 365 So. 3d 1242, 1246 (Fla. 1st DCA 2023) (quoting *Robbins v. Hess*, 659 So. 2d 424, 427 (Fla. 1st DCA 1995)).

[12] Our contract probably does satisfy the statute of frauds. A contract to ship a truck needn't be in writing under Florida's statute of frauds. *See generally* FLA. STAT. §§ 725.01–08 (listing those contracts that do require a writing). And "[i]t is not necessary for a party to be a signatory to a contract to be

however, diverge on a central issue—*viz.*, whether the Warehouse Receipt for the Mack truck incorporated by reference the terms and conditions in Antillean's regular form bill of lading.

Under Florida law, "[a] document may be incorporated by reference in a contract if the contract specifically describes the document and expresses the parties' intent to be bound by its terms. The contract must contain more than a mere reference to the collateral document, but it need not state that it is 'subject to' the provisions of the collateral document to incorporate its terms." *Jenkins v. Eckerd*, 913 So. 2d 43, 51 (Fla. 1st DCA 2005) (quoting *Mgmt. Comput. Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So. 2d 627, 631 (Fla. 1st DCA 1999)). While acknowledging this rule, the Eleventh Circuit has noted that it "seems to apply only when the collateral document's terms and conditions govern the actual dispute, not when . . . the collateral document simply clarifies the meaning of terms and conditions, all of which are contained in the contract itself." *Roman v. Spirit Airlines, Inc.*, 2021 WL 4317318, at *2 n.1 (11th Cir. Sept. 23, 2021). "It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Lowe v. Nissan of Brandon, Inc.*, 235 So. 3d 1021, 1026 (Fla. 2d DCA 2018) (quoting *BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011)).

It's safe to say that *something* was incorporated into the Warehouse Receipt. "In accepting this warehouse receipt," after all, "the shipper, consignee and owner of the goods agree to be bound by all stipulations, exceptions and conditions, whether written, printed or stamped on the Carrier's Bill of Lading." Warehouse Receipt. But was it Antillean's *regular form* bill of lading or a *specific* bill of lading that was to be issued for Jeanty's Mack truck once he provided title and payment? If it was the former,

---

bound by its terms, but ordinary contract law governs such a situation." *Steritech Grp., Inc. v. MacKenzie*, 970 So. 2d 895, 898 (Fla. 5th DCA 2007). "A nonsignatory's consent to a contract can be manifested by both a party's words and actions." *BPO Seidman, LLP v. Bee*, 970 So. 2d 869, 874 (Fla. 4th DCA 2007).

14

then Antillean is right, because—as far as we can tell—Antillean uses a regular form bill of lading that *always* has the same COGSA language. But, if it was the latter, Jeanty prevails, because Antillean's corporate representative admitted that no specific bill of lading was ever issued. *See* Valdes Depo. at 13:16–18 ("[T]here was no bill of lading issued, there is really no contract. It was never sent to be shipped. They didn't pay.").

On this question, our former Chief Judge's opinion in *AAA Int'l Freight Forwarding Grp., Inc. v. King Ocean Serv. de Venezuela, S.A.*, 2000 WL 33956708 (S.D. Fla. June 13, 2000) (Moore, J.), is instructive. The shipper there contracted with a carrier to ship a container from Florida to Venezuela. *Id.* at *1. After the carrier took control of the container—but before the container was loaded onto the carrier's vessel—armed men broke into the container and stole its contents.[13] *Ibid.* The shipper sued the carrier, "alleging that, because no bill of lading was ever issued by [the carrier], it is strictly liable as a common carrier of goods for the loss of [the shipper's] goods." *Id.* at *3. But the carrier "responded by filing a motion for summary judgment against [the shipper], claiming in part that: (1) the parties' rights and liabilities are governed by the bill of lading which *would have issued* had the cargo not been lost prior to being loaded aboard the vessel, [and] (2) the bill of lading incorporated [COGSA] for all time periods relevant to this action[.]" *Ibid.* (emphasis added). The court agreed, noting that "it is well settled in this Circuit that the bill of lading that *would have issued* in the ordinary course of business represents the contract governing the relationship between the shipper and carrier even if it was not actually issued." *Ibid.* In so holding, the court quoted from a 1928 Fifth Circuit[14] case for the proposition that

---

[13] Thieves broke into the container while it was being transported by a third-party trucking company hired by the carrier to deliver the container from the shipper to the carrier's facility. *AAA Int'l*, 2000 WL 33956708, at *1.
[14] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

> [the carrier] was required by law to issue a bill of lading. . . . [The shipper] is presumed to know the law, and therefore must have known the terms and conditions on which the goods were received and would be transported would be contained in a bill of lading to be issued later. . . . [A]n implied understanding arose from common business experience that the carrier would issue such a bill of lading as it was custom to issue to shippers in the usual course of its business. . . . [A] shipper, in the absence of a special contract, must be presumed to deliver his goods on the terms and conditions usually and customarily imposed by the carrier in the regular course of business.

*Id.* at *4 (quoting *Luckenbach S.S. Co. v. Am. Mills Co.*, 24 F.2d 704, 705 (5th Cir. 1928)).

Our case is just the same. As in *AAA*, we're adjudicating a dispute between a shipper and a carrier who had previously done business together. As in *AAA*, the carrier's regular form bill of lading triggered COGSA coverage when the carrier took control of the freight. As in *AAA*, the freight in question went missing while in the carrier's control, but before it had been loaded onto the carrier's vessel. And, as in *AAA*, a *specific* bill of lading had not yet been issued when the cargo was lost. Finding AAA's reasoning persuasive, we now reach the same conclusion and hold that Antillean's *regular form* bill of lading governs this dispute, even though no *specific* bill of lading was ever issued.

And this seems to be the well-settled rule in our Circuit. *See, e.g.*, *Distribuidora*, 2019 WL 13141570, at *6 ("It is well settled that, as long as a bill of lading would have been issued in the ordinary course of business, the bill of lading serves as a contract governing the relationship of a shipper and carrier even if it was not actually issued." (quoting *Ironfarmers Parts & Equip. v. Compagnie Generale Mar. et Financiere*, 1994 WL 730895, at *2 (S.D. Ga. June 3, 1994))); *N.H. Ins. Co. v. Seaboard Marine, Ltd.*, 1992 WL 33861, at *3 (S.D. Fla. Jan. 2, 1992) (Ryskamp, J.) (applying the reasoning of *Luckenbach S.S.* and finding that the terms of a bill of lading issued *after* cargo was damaged still governed even though there was an "absence of a prior course of dealing" between shipper and carrier).[15]

---

[15] We're not suggesting that Antillean's regular form bill of lading would have applied if (1) Jeanty and Antillean had *never* done business before and (2) Antillean hadn't issued the Warehouse Receipt that specifically mentioned the form bill of lading to Jeanty's driver. That scenario would present a more complicated question. In *Montaze Broz, LLC v. Global Ocean Line, Inc.*, for example, the court found (at the motion-to-dismiss stage) that the carrier's regular form bill of lading didn't apply to the loss of a

16

We therefore hold that the terms and conditions of Antillean's regular form bill of lading govern the loss of Jeanty's Mack truck because (1) the Warehouse Receipt so specified and (2) Jeanty was on notice that this was Antillean's standard business practice. And, because Antillean's regular form bill of lading applies, so too does COGSA—along with its complete preemption of Jeanty's contract claim.

\*\*\*

After careful review, therefore, we hereby **ORDER and ADJUDGE** that the Plaintiff's Motion to Remand [ECF No. 42] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on December 7, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

---

pick-up truck that occurred before embarkation because the shipper—at least according to his Complaint—hadn't received any documentation from the carrier that mentioned a bill of lading. *See* 2023 WL 4998575, at *4 (S.D. Fla. Aug. 4, 2023) (Bloom, J.) ("The [c]omplaint further alleges Defendant did not issue, nor did it provide Plaintiff, 'a Bill of Lading *or any other written contract* pursuant to which the parties agreed to terms or conditions incident to' Cargo transport." (quoting the complaint (emphasis added)). And there was no indication in the opinion that the shipper and carrier had a prior history of working together—as a result of which the shipper would have been on notice of the carrier's regular policies. *See generally ibid.*